UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

HABIBUR RAHMAN,

                                        Plaintiff,                12-CV-09095 (SN)

                        -against-                                 OPINION & ORDER

KAPLAN CORNELIA, INC. d/b/a PAPAYA
DOG, et al.,

                                        Defendants.

-----------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge:

        On December 12, 2012, plaintiffs Habibur Rahman ("Rahman") and Raja Ahmed filed

this action against Kaplan Cornelia, Inc., doing business as Papaya Dog, and individual

defendants (collectively, the "defendants"), alleging violations of the Fair Labor Standards Act,

29 U.S.C. § 201, *et seq.*, and New York Labor Law.

        On May 16, 2013, Rahman appeared for a settlement conference before the Court, along

with the individual defendants, who had authority to bind Papaya Dog. Plaintiff Ahmed did not

attend the conference.[1] At the settlement conference, I recommended a settlement sum and

requested that the parties, through their counsel, accept or reject the sum within 24 hours. The

following day, all parties appeared to have accepted the Court's recommendation. Thereafter,

however, Rahman objected and located new counsel, who insists that Rahman never authorized

his former lawyer to accept the settlement proposal.

_____

[1] Ahmed filed a Consent to Become a Party Plaintiff Under the F.L.S.A. on April 8, 2013, but he has
never appeared in this action and because he is not a named plaintiff in the First Amended Complaint,
filed on September 13, 2013, he was terminated from this action. Based on Rahman's failure to respond to
a Request to Admit, defendants believe Rahman used the name Raja Ahmed as an alias.

The defendants have moved to enforce the settlement agreement, purportedly accepted on May 17, 2013. Following a hearing on the matter, the Court finds that a binding and enforceable agreement was reached on May 17, 2013, and that former counsel had authority to accept the settlement agreement on behalf of Rahman. Accordingly, defendants' motion to enforce the settlement agreement is GRANTED, and Rahman's claims are dismissed.

## BACKGROUND

**The Settlement Conference**

Rahman worked at the Papaya Dog in the West Village from approximately March 2005 until March 2013. He alleges he typically worked 72 hours each week and was paid a fixed weekly salary of $450, regardless of how many hours he worked. The defendants deny that Rahman worked more than 40 hours per week.

Following limited discovery, a settlement conference was held on May 16, 2013 in the courthouse. Rahman appeared with his former counsel, Peter Cooper of the firm Cilenti & Cooper, P.L.L.C., and defendants were represented by Michael DeLisa of the DeLisa Law Group, PLLC. Although the contents of the settlement conference were held off the record, defendants vigorously rejected Rahman's claims of minimum wage and over-time violations. The conference lasted nearly two and a half hours. Based on the positions of the parties and my assessment of the strength and weaknesses of the case, I made a recommendation for settlement and directed that the parties consider my recommendation and contact my chambers the following day.

On May 17, 2013, the parties, through their counsel, contacted my chambers and accepted the Court's recommendation. Accordingly, at 5:21 p.m. that afternoon, my law clerk sent counsel an email stating: "Counsel, The parties to Rahman v. Kaplan Cornelia, Inc., 12-cv-

09095 (JMF)(SN), have accepted Judge Netburn's recommendation and, therefore, there is a settlement agreement. Thank you." The following day, Rahman's former counsel Peter Cooper sent an email to defendants' counsel stating "I am pleased we have a settlement agreement" and forwarded a draft memorialization of its terms, which reflected the terms that I had recommended at the conference and that the parties had accepted. See Michael C. DeLisa Decl., dated Dec. 2, 2013, at Ex. G. See also Peter H. Cooper Decl., dated May 31, 2013, at note 1.

On May 20, 2013, my law clerk contacted counsel regarding the need for a fairness hearing given that the case was settling FLSA claims. The parties were given the option, among several, to consent to my jurisdiction, at which time I would approve the settlement agreement as fair and reasonable, having presided over the settlement conference. The parties elected to consent to my jurisdiction. Mr. Cooper signed a Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (the "Consent Notice") on behalf of Rahman on May 21, 2013[2], and Mr. DeLisa and the individual defendants signed it on May 28, 2013. It was approved by District Judge Jesse M. Furman on June 4, 2013.

On June 3, 2013, however, Mr. Cooper filed a motion to withdraw as counsel, citing "irreconcilable differences" with his client. Of relevance to the pending motion, Mr. Cooper stated Rahman "accepted the Court's recommendation" for settlement, but had since "indicated to our office that he wished to change his mind and not settle the case for the sum recommended by the Magistrate Judge." Peter H. Cooper Decl., dated May 31, 2013, at ¶ 4. Following an *ex parte* conversation with the Court – with notice thereof to defendants' counsel – the Court granted the motion to withdraw.

---

[2] Rahman himself did not sign the form, though it is typically signed by lawyers only.

On July 8, 2013, the Lee Litigation Group PLLC appeared on behalf of Rahman. An amended complaint was filed on September 13, 2013.[3]

**The Motion and Hearing**

The Court held an Initial Status Conference on October 18, 2013, at which time defendants' counsel indicated that it intended to file a motion to enforce the settlement agreement. Defendants' motion was filed on December 9, 2013, and was fully submitted on December 30, 2013.

Defendants filed a declaration from Mr. DeLisa, to which are attached several exhibits, including among other things: (i) the Peter H. Cooper Motion to Withdraw Declaration; (ii) the email from my law clerk confirming a settlement had been reached, and the follow-up email from my law clerk concerning court approval of the settlement; (iii) the executed Consent Notice; and (iv) a May 18, 2013 email from Mr. Cooper to Mr. DeLisa, expressing Mr. Cooper's satisfaction with the settlement and attaching a draft settlement agreement and release.

In addition to his memorandum of law, Rahman submitted a sworn declaration. He stated that on May 16, 2013, immediately following the settlement conference, he told Mr. Cooper that he was "dissatisfied with the offer," that Mr. Cooper "pressured me to accept it" but also that Mr. Cooper gave him a day to think about it. Habibur Raham Decl., dated December 19, 2013, at ¶ 5. On May 17, 2013, Rahman "called Mr. Cooper and informed him that due to my dissatisfaction with the settlement amount, I did not accept the proposal. Mr. Cooper continued to pressure me to accept the settlement. I continued to inform him that I was not going to accept because the amount offered was not enough." Id. at ¶ 6. Rahman further stated that "[d]ays after I informed Mr. Cooper of my rejection of the settlement offer, he continued to insist that I agree to the amount proposed by Judge Netburn. I informed him that I would not accept the settlement offer

---

[3] On November 19, 2013, Salvador Vazquez filed a Consent to Sue Under The F.L.S.A.

and I fired him as my attorney." <u>Id</u>. at ¶ 7. Finally, Rahman states that "[o]n May 20, 2013, three days after firing Mr. Cooper, I retained Lee Litigation Group PLLC as my new counsel." <u>Id</u>. at ¶ 20.

 In light of the disputed question as to whether Rahman directed his counsel to accept the Court's recommendation, the Court held a hearing on January 27, 2014. Rahman and Mr. Cooper both testified. At the hearing, an email, dated May 17, 2013 at 10:48 a.m., from Mr. Cooper to Rahman was introduced. In this email, Mr. Cooper reiterated the terms of the agreement, "strongly urged" Rahman to accept, but also stated that Rahman is "not required to accept the judge's recommendation, although you will need to really focus on your case if you don't." At the hearing, Mr. Cooper testified that his last admonition – that "you will need to really focus on your case" – was because Rahman had not been actively pursuing his claims and cooperating with counsel to date. Mr. Cooper testified that, later that day (May 17) and after this email was sent, Rahman and he spoke by telephone, and Rahman authorized Mr. Cooper to accept the settlement offer. He further testified that, thereafter, he proceeded as though the case had been resolved – by sending a draft agreement and release to Mr. DeLisa on May 18, and signing the Consent Notice on May 21. Mr. Cooper testified that he did not have any communication with his client between May 17 and May 30 despite repeated attempts. Mr. Cooper further testified that on May 30, Rahman called Mr. Cooper and said that he had changed his mind and refused the settlement. On May 31, Rahman appeared at Mr. Cooper's office, at which time Mr. Cooper showed him a copy of his motion to withdraw as counsel and discussed with Rahman the substance of the motion. Mr. Cooper testified that his next point of contact with this case was on July 8, 2013, when he received an email from attorney C.K. Lee requesting the Rahman case file. Mr. Lee arranged for it to be retrieved the following day from Mr. Cooper's law offices.

Rahman testified that he never accepted the settlement offer and that he did not authorize Mr. Cooper to accept it on his behalf. He testified that he told Mr. Cooper by telephone on Friday, May 17, 2013, that he refused the offer, and that he went to Mr. Cooper's office on Saturday, May 18 and fired him on or around that same day. Mr. Cooper testified that his office is not open on Saturdays and denied that Rahman ever fired him before he filed his motion to withdraw as counsel.

## DISCUSSION

**I.    Enforceability of Settlement Agreements**

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." Mtgs & Exp'tns Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974) (internal citations omitted). Indeed, "[s]uch power is 'especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings.'" Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 444 (2d Cir. 2005) (quoting Janus Films, Inc. v. Miller, 801 F.2d 578, 583 (2d Cir. 1986)).

A settlement agreement is a "contract that is interpreted according to general principles of contract law." Omega Eng'g., 432 F.3d at 443. Once a court finds that parties reached a settlement agreement, the prevailing view is that such agreement is binding on all parties, "even if a party has a change of heart between the time of the agreement . . . and the time it is reduced to writing." Elliot v. City of New York, 11 Civ. 7291 (RWS), 2012 WL 3854892, at *2 (S.D.N.Y. Sept. 5, 2012); accord U.S. v. Bank of New York, 14 F.3d 756, 759 (2d Cir. 1994) ("When a party makes a deliberate, strategic choice to settle, she cannot be relieved of such a choice merely because her assessment of the consequences was incorrect.") (citing Ackermann v. U.S, 340 U.S. 193, 198 (1950) (litigants cannot be relieved of the consequences of their strategic

decisions merely because hindsight indicates that a decision was wrong)); Powell v. Omnicom, BBDO/PHD, 497 F.3d 124, 129 (2d Cir. 2007) ("The settlement remains binding even if a party has a change of heart between the time he agreed to the settlement and the time those terms are reduced to writing."); Omega Eng'g., 432 F.3d at 445 ("It is an elementary principle of contract law that a party's subsequent change of heart will not unmake a bargain already made."); U.S. Fire Ins. Co. v. Pierson & Smith, Inc., 06 Civ. 382 (CM)(LMS), 2007 WL 4403545, at *3 (S.D.N.Y. Dec. 17, 2007) (where a party has entered into an agreement to settle, "the party cannot avoid the settlement by refusing to sign the papers that would memorialize the terms of the agreement that were reported to the court"); Foster v. City of New York, 96 Civ. 9271 (PKL), 2000 WL 145927, at *4 (S.D.N.Y. Feb. 7, 2000) ("This Court must enforce a binding oral agreement, notwithstanding that plaintiff may have had a change of heart."); Rivera v. State, 115 A.D.2d 431, 432 (1st Dep't 1985) (refusing to vacate a settlement because the court found "nothing but afterthought and change of mind") (citations omitted).

A presumption in favor of enforcement reflects the value that courts place on negotiated settlement agreements. Willgerodt v. Hohri, 953 F. Supp. 557, 560 (S.D.N.Y. 1997) aff'd sub nom. Majority Peoples' Fund for 21st Century, Inc. v. Hohri, 159 F.3d 1347 (2d Cir. 1998) ("Settlement agreements are strongly favored in New York and may not be lightly cast aside."); Hallock v. State, 64 N.Y.2d 224, 230 (1984). It is also consistent with basic contract principles, which maintain that reformation of a settlement agreement is an extraordinary remedy. 27 Richard A. Lord, Williston on Contracts § 70:33 (4th ed. 2012) (reformation is appropriate only to correct a material, mutual mistake); Beecher v. Able, 441 F. Supp. 426, 429-30 (S.D.N.Y. 1977) aff'd, 575 F.2d 1010 (2d Cir. 1978).

Mutual assent of the parties to the terms of a settlement is the essential component of a settlement agreement. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) ("Mutual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance.") (citing Maffea v. Ippolito, 247 A.D.2d 366, 367 (2d Dep't 1998). While a written document is the most traditional evidence of mutual assent, parties may enter and be bound by an agreement without signing a fully executed contract. Winston v. Mediafare Entm't Corp., 777 F.2d 78 (2d Cir. 1986); Bonnette v. Long Island Coll. Hosp., 819 N.E.2d 206 (2004) (recognizing that the court may enforce a settlement agreement that is not reduced to writing). "Preliminary agreements" that address all negotiated terms are enforceable, even if they are oral, Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 322 (2d Cir. 1997), or written in an email, Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC, 04 Civ. 1621 (KMW)(AJP), 2005 WL 1377853 (S.D.N.Y. June 9, 2005), and even if they contemplate a subsequent memorialization in an executed document, Teachers Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987).

Where there is no final document on which to rely, the controlling factor in determining whether parties are bound by an agreement is whether a court has evidence of the parties' intent to be bound. Powell, 497 F.3d at 129; Winston, 777 F.2d at 80. Because a court cannot decipher the "secret or subjective intent" of the parties, "it is the objective intent . . . that controls." Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997); accord 22 N.Y. Jur. 2d, Contracts § 29 (2013) ("In the formation of a contract, only the overt acts of the parties may be considered in determining mutual assent.")).

The Court of Appeals for the Second Circuit has adopted a four-factor test to evaluate disputes around parties' settlement intentions in the absence of a formalized writing.[4] Courts consider whether: (1) there has been an express reservation of the right not to be bound in the absence of a writing; (2) there has been partial performance of the contract; (3) all of the terms of the alleged contract have been agreed upon; and (4) the agreement at issue is the type of contract that is usually committed to writing."  Winston, 777 F.2d at 80. The factors "may be shown by oral testimony or by correspondence or other preliminary or partially complete writings." Id. at 81 (internal quotation omitted). No single factor is dispositive. Ciaramella, 131 F.3d at 323.

### A.  Express Reservation

There is no evidence of an express reservation of the right not to be bound until the parties signed a written document memorializing their verbal settlement agreement. The issue was not raised at the May 16 settlement conference nor was it a condition of the agreement. Indeed, the May 17 email from my law clerk states that "there is a settlement agreement," and Mr. Cooper's May 18 email to Mr. DeLisa states "I am pleased we have a settlement." Delyanis v. Dyna-Empire, Inc., 465 F. Supp. 2d 170 (E.D.N.Y. 2006) (finding that, when plaintiff's counsel stated in an email to the mediator and the defendants' counsel that the case was settled and that the mediator could inform the Court, a binding agreement had been formed because

---

[4] This Circuit has not resolved the question of whether a district court should apply federal or state law to decide a motion to enforce a settlement, where the jurisdiction of the district court rests on a federal question. See, e.g., Powell, 497 F.3d at 129 n.1; Ciaramella, 131 F.3d at 322 n.1. In Ciaramella, however, the Court of Appeals noted that there was "no material difference" between New York law and federal common law on this issue. See Ciaramella, 131 F.3d at 322. See also Figueroa v. New York City Dep't of Sanitation, 475 F. App'x 365, 366 (2d Cir. Apr. 12, 2012) (recognizing that "the question of whether federal or state law controls the enforceability of a settlement agreement in this context is an open one" and declining to decide that question). The majority of district courts have applied only federal common law in federal question cases when a motion is filed to enforce an oral settlement agreement. See, e.g., Pierre v. Chase Inv. Servs. Corp., 10 Civ. 1740 (SAS), 2013 WL 709055 (S.D.N.Y. Feb. 25, 2013) reconsideration denied, 2013 WL 1287330 (S.D.N.Y. Mar. 28, 2013); Alvarez v. City of New York, 146 F. Supp. 2d 327, 335 n.6 (S.D.N.Y. 2001). Because the Court of Appeals has noted that there is no material difference between New York law and federal common law, I apply only federal law in evaluating this matter.

there was no express reservation of the right not to be bound; this was held even though counsel referenced a future formalized agreement that had not yet been executed). And although the parties contemplated that the terms of their agreement would be reduced to writing – indeed, Mr. Cooper's May 18 email also attached a draft settlement agreement and stated "I am attaching a proposed agreement for you to edit. Once you approve, I'll work on getting it signed and the case dismissed." – that alone does not preclude enforcement under the oral agreement. Shape CD, Ltd. v. Quiksilver, Inc., 07 Civ. 2033 (PKC), 2008 WL 2009668, at *2 (S.D.N.Y. May 6, 2008) ("The absence of a fully executed settlement agreement need not be fatal to enforcement, even if one were originally contemplated by the parties." (citing Winston, 777 F.2d 78)).

Rahman argues that the parties intended there to be a written agreement because of the need for judicial approval of a case settling FLSA claims. But judicial approval of a settlement does not require a written settlement agreement, and the parties' election to consent to my jurisdiction to facilitate the judicial approval process demonstrates their desire to finalize approval as expeditiously as possible – likely without written submissions. In any event, the desire for judicial approval is not an "express reservation" of the right not to be bound absent a written agreement. Accordingly, the first Winston factor weighs in favor of enforcement.

### B.  Partial Performance

Actions taken after the May 16 conference and May 17 acceptance suggest that the parties understood that the case was settled. As discussed above, on May 18, Mr. Cooper sent Mr. DeLisa a draft agreement, and on May 21 and 28, plaintiff's and defendants' counsel, respectively, executed the Consent Notice for the purpose of having me approve the settlement agreement as fair and reasonable without the need for additional litigation. Accordingly, this factor weighs strongly in favor of enforcement. See Jackson v. New York City Dep't of Educ.,

10 Civ. 9193 (DLC), 2012 WL 1986593, at *3 (S.D.N.Y. June 4, 2012) (citing <u>U.S. v. U.S.</u>
<u>Currency in the Sum of Six Hundred Sixty Thousand, Two Hundred Dollars ($660,200.00),</u>
<u>More or Less</u>, 423 F. Supp. 2d 14, 28-29 (E.D.N.Y.2006) (drafting and delivering settlement
documents constitutes partial performance)).

Rahman contends that the Court should not consider the execution of the Consent Notice
as evidence of partial performance because Rahman himself did not sign it. The Consent Notice
expressly permits execution by "parties or attorneys," and it is most typical that only attorneys
sign this application. Thus, the absence of Rahman's signature tells us nothing. Rahman further
contends that he "re-commenced" the litigation on September 9, 2013, by filing an amended
complaint with new counsel. Rahman's conduct nearly four months after the apparent
acceptance, however, does not change the Court's assessment that his counsel and defendants
were proceeding as though the case had been resolved.

### C.  Remaining Material Terms to Negotiate

The third <u>Winston</u> factor examines whether all of the terms of the alleged contract were
agreed upon. This factor favors enforcement.

The Court recommended a simple settlement: payment of a settlement sum in exchange
for a release and dismissal of all of Rahman's claims. Upon accepting the Court's
recommendation, there were no further terms to negotiate. Indeed, in the copy of the proposed
settlement agreement sent by Mr. Cooper, these are the only material terms. (DeLisa Decl. at Ex.
G.) Defendants' counsel was invited to "edit" the proposed agreement but there is no evidence
that they did. Ten days after receiving this proposed agreement, defendants' counsel executed the
Consent Notice with the understanding that the Court would then approve as fair and reasonable
the settlement based upon the terms recommended at the May 16 conference. This further

communicated to the Court that the parties had achieved a settlement. See Jackson, 2012 WL 1986593, at *3 ("most significantly, [the parties] communicated the settlement to the Court").

Rahman argues that there are "several material terms" in the agreement that were not explained to him at the May 16 conference. He does not identify which terms those are. This is enough to convince the Court that, as of May 17, no material terms remained to be negotiated.

Notwithstanding the absence of any argument, the Court independently reviewed the draft agreement to see whether it includes provisions that are material and that would likely be the subject of additional negotiations. The draft agreement contains a release of all claims and a warranty that Rahman has no other pending claims against defendants. It includes the settlement sum, a short payment schedule, and a statement of tax considerations. This is the core of the settlement agreement and was explicit or implicit in what the Court recommended and the parties accepted. The agreement also contains a representation that Rahman would not "directly or indirectly commence, continue, assist or participate" in future lawsuits or claims against the defendants. This term was not discussed at the settlement, but it is hard to argue that it is material, and Rahman does not. The remaining terms are boilerplate settlement provisions related to integration, severance, competence and execution. None of these terms can be legitimately deemed material.

### D.  Usual Form of Agreement

The fourth Winston factor considers "whether the agreement at issue is the type of contract that is usually committed to writing." This factor weighs lightly in favor of enforcement.

The agreement here does not approach the length or complexity of those frequently considered to require a writing. See, e.g., Ciaramella, 131 F.3d at 326 (finding that an eleven-page settlement agreement that included terms that would apply in perpetuity required a writing);

Winston, 777 F.2d at 83 (finding that a four-page agreement for $62,500 with a payment plan spanning years was sufficiently complex to require a writing). There was no discussion of a payment plan and the proposed memorialization of the terms is just five pages long, much of it boilerplate provisions. Thus, although most settlement agreements in this Court are written, there is nothing complicated about this agreement that would require strict adherence to that tradition.

Rahman argues that because he was settling FLSA claims, judicial approval is required *and*, therefore, a writing is essential. The law on this point is not settled. See Cabrera v. Nassau Med. Servs., P.C., 526 F. App'x 12, 14 (2d. Cir. 2013) (recognizing that the law is not settled as to whether FLSA requires court approval of a settlement agreement). It is true that the widely held view in this district is that parties to a FLSA case cannot resolve the dispute by private agreement and that, instead, they must seek judicial review of any settlement. This article of faith has been questioned recently by District Judge Brian Cogan of the Eastern District of New York in a well-reasoned decision. See Picerni v. Bilingual SEIT & Preschool Inc., 925 F. Supp. 2d 368, 372 (E.D.N.Y. 2013). See also Lima v. Hatsuhana of USA, Inc., 13 Civ. 3389 (JMF) 2014 WL 177412 (S.D.N.Y. Jan. 16, 2014) (inviting briefing to permit the Court to reconsider its previously held view that FLSA settlements required judicial approval).

The Court need not resolve the issue of whether judicial approval of FLSA settlements is required by the Act in order to resolve whether this settlement required a written document. The parties executed the Consent Notice for the explicit purpose of having me approve the settlement without the need for further submissions. Indeed, had Judge Furman's approval of the Consent Form been filed on June 3, 2013 (instead of June 4) and Mr. Cooper's motion to withdraw filed on June 4, 2013 (instead of June 3), the Court would likely have approved the settlement and dismissed the action before Mr. Cooper could withdraw. As the parties knew, this Court would

approve the settlement – having conducted the settlement conference and discussed the merits of the claims and defenses at length with the parties – without requiring further written submissions.

Even if the Court were to find that a settlement agreement of this nature is normally reduced to writing, several considerations justify the Court's confidence in the parties' intent to be bound by the oral agreement. The terms of the agreement were discussed with me during the May 16 settlement conference, and Rahman was given 24 hours to consider *those terms*. He was not expected to counter-offer and, in fact, did not propose alternative terms when his counsel called the Court with his client's acceptance the following day. The May 17 telephone call, memorialized by the May 17 law clerk email, is therefore akin to an in-court acceptance of the terms. See Omega Eng'g, 432 F.3d at 444 (trial court's inherent power to enforce a settlement agreement is "especially clear where the settlement is reported to the court during . . . significant courtroom proceedings") (quotation marks omitted).

Thus, although settlement agreements are generally reduced to writing, several considerations favor a finding that the settlement of this case need not have been memorialized.

In sum, the first, second, and third Winston factors strongly favor enforcement, and the fourth factor also favors enforcement, though less forcefully. Based on this, I find that the parties intended to be bound after counsel contacted the Court on May 17, 2013, to accept the Court's settlement recommendation.

## II.      Exemptions from Enforcement

### A.  Authority to Settle

Having found an enforceable settlement, the Court could, nonetheless, reject it if plaintiff's counsel was not authorized by his client to accept the terms. Although "[i]t is axiomatic that the decision to settle a case rests with the client," there is a presumption that "an

attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had the authority to do so." In re Artha Mgmt. Inc., 91 F.3d 326, 329 (2d Cir. 1996). The authority may be actual or apparent. United States v. Int'l Bhd. of Teamsters, 986 F.2d 15, 20 (2d Cir. 1993). Whether an attorney possesses actual authority to settle rests on an examination of the dealings between the attorney and the client to determine whether the attorney's actual authority "may be inferred from the words or conduct of a client which the client had reason to know would be regarded by the attorney as authorization to settle." Joseph v. Worldwide Flight Servs., Inc., 480 F. Supp. 2d 646, 653 (E.D.N.Y. 2007) (quoting United States v. Manning, 107 F.3d 5, 1997 WL 62973, at *1 (2d Cir. 1997); accord, Int'l Bhd. of Teamsters, 986 F.2d at 20.

The question of apparent authority, on the other hand, "is normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent." Green Door Realty Corp. v. TIG Ins. Co., 329 F.3d 282, 289 (2d Cir. 2003) (internal quotation marks omitted). See also Restatement (Second) of Agency § 26 (2012) (the "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account"); Restatement (Third) of Law Governing Lawyers § 27 (2000) ("A lawyer's act is considered to be that of the client in proceedings before a tribunal . . . if the tribunal . . . reasonably assumes that the lawyer is authorized to do the act on the basis of the client's (and not the lawyer's) manifestations of such authorization."). Thus, an attorney cannot create apparent authority by his own actions or representations, Fennell v. TLB Kent Co., 865 F.2d 498, 502 (2d Cir. 1989) (citing Trustees of UIU Health & Welfare Fund v. New York Flame Proofing Co., 828 F.2d 79, 84 (2d Cir. 1987)), and by merely retaining an attorney a client does not create apparent authority for the attorney to

settle the client's case, id. (citing United States v. Beebe, 180 U.S. 343, 352 (1901)). Ultimately, however, because of the strong public policy favoring settlements, an attorney of record who enters into a settlement agreement on behalf of his client is presumed to have the authority to do so, and a party who challenges such an attorney's authority to settle bears the burden of proving with affirmative evidence that the attorney lacked authority. Artha Mgmt., 91 F.3d at 329.

Here, Mr. Cooper appeared, with Rahman and on his behalf as his lawyer, at the May 16, 2013 conference. The Court spent more than two hours with the parties, in open court and in *ex parte* discussions. Throughout the conference, Rahman acted consistent with Mr. Cooper as his counsel and representative. When I instructed Rahman to consider the settlement recommendation and to have Mr. Cooper report back to the Court the following day on his decision, Rahman did not say that he rejected the recommendation or that his attorney would be unauthorized to speak on his behalf. I have little trouble concluding that Mr. Cooper acted with apparent authority on Rahman's behalf at that conference and when he accepted the recommendation the following day.

Rahman testified, however, that he revoked that authority between the settlement conference and the following day. I do not credit Rahman's testimony on this point. He testified that he told Mr. Cooper on Friday, May 17 that he did not accept the settlement recommendation and that he appeared in person at Mr. Cooper's office on Saturday, May 18, to again reject the settlement recommendation and terminate his attorney-client relation. But Mr. Cooper – an attorney in good standing in this Court[5] and with an active docket and no motive to lie – denies that Rahman rejected the offer on May 17, or that Rahman came to his office on a Saturday (when his office is typically closed) to terminate the relationship. Indeed, Mr. Cooper testified that after authorizing him to accept the offer, Rahman stopped communicating with him

---

[5] The Court's Grievance Committee has never received a complaint concerning Mr. Cooper.

altogether, until the end of the month when he called Mr. Cooper to say he "changed his mind" and no longer accepted the settlement. Then, after waiting nearly two weeks to advise his attorney that he no longer accepted the settlement agreement, Rahman waited nearly six weeks before retaining new counsel. Thus, Rahman's own conduct was not consistent with someone who had consistently rejected a settlement and was pursuing his claims vigorously.

Moreover, Mr. Cooper's conduct following the May 17 acceptance – including sending a draft settlement agreement and release on May 18 and signing the Consent Notice on May 21 – is consistent with Mr. Cooper's testimony that his client had authorized him to accept the settlement recommendation and that the case was resolved. This is further evidence to justify the Court's reservation about the truthfulness of Rahman's testimony. Accordingly, Rahman has not satisfied his burden to rebut the presumption that his attorney had authority to accept the settlement agreement on his behalf. See Artha Mgmt., 91 F.3d at 329.

**B.  Right to Revoke**

Finally, Rahman argues that even if there was a binding and enforceable agreement, he was entitled to revoke it under the review and revocation provisions of the Age Discrimination in Employment Act of 1967 (ADEA), as amended by the Older Worker Benefit Protection Act (OWBPA), 29 U.S.C. § 621 *et seq*. The OWBPA provides that "[a]n individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary," and "a waiver may not be considered knowing and voluntary unless at a minimum" certain requirements are met. 29 U.S.C. § 626(f)(1). The statute provides various requirements in order to find that a waiver is knowing and voluntary. See id. at § 626(f)(1). Ordinarily, OWBPA requires that "the individual [be] given a period of at least 21 days within which to consider the agreement," and that "the agreement provide[] that for a period of at least 7 days following the execution of such

agreement, the individual may revoke the agreement." <u>Id.</u> at § 626(f)(1)(F)(i), (f)(1)(G). But for settlements of "an action filed in court," a knowing and voluntary waiver requires only that the "individual is given a reasonable period of time within which to consider the settlement agreement." <u>Id.</u> at § 626(f)(2). <u>See also</u> <u>Powell</u>, 497 F.3d at 131-32.

Pursuant to § 626(f)(1)(F), Rahman argues that he had at least 21 days to consider the settlement and seven days from execution to revoke. Because, at a minimum, there is no dispute that Rahman rejected or revoked his acceptance of the settlement on May 30, 2013, at the latest, Rahman argues the agreement cannot be enforced against him.

Rahman's arguments fail on two grounds. First, because he is settling claims raised in "an action filed in court," he is entitled only to "a reasonable period of time" to consider the settlement agreement. <u>See</u> <u>Powell</u>, 497 F.3d at 132. The Court of Appeals has held that even "a few hours [that] elapsed between the beginning of settlement negotiations and [the plaintiff's] assent to those terms in-court" was reasonable and therefore a settlement agreement is enforceable notwithstanding the OWBPA. <u>Id.</u> Second, even if the 21-day/7-day review and revoke provisions were applicable to the settlement of a court action, Rahman overstates the effect of a settlement agreement that fails to incorporate these provisions. The statute provides that where a release fails to comply with the OWBPA, an individual "may not waive any right or claim under [the ADEA]." 29 U.S.C. § 626(f)(1). The statute has no effect on non-ADEA claims, such as the FLSA and New York Labor Law claims asserted here. <u>See</u> <u>O'Conner-Goun v. Weill Cornell Med. Coll. of Cornell Univ.</u>, 11 Civ. 7377 (JSR), 2013 WL 3872220, at *5 (S.D.N.Y.

July 29, 2013) (citing cases).[6] Accordingly, any failure to comply with the OWBPA would not affect the enforceability of this settlement agreement and dismissal of Rahman's claims.[7]

## CONCLUSION

For the reasons discussed above, defendants' Motion to Enforce the Settlement Agreement is GRANTED. The case is settled for a payment of the settlement sum to Rahman in exchange for a release of all defendants as to all non-ADEA claims that are or could have been alleged in the complaint.[8] Payment shall be made within 30 days of this order unless a Notice of Appeal is filed. The Clerk of Court is directed to terminate the motion at Docket No. 47.

Plaintiff's counsel shall file a letter by February 21, 2014, advising the Court whether it intends to pursue any claims brought by Salvador Vazquez in this action. Defendants' counsel may respond to the extent it believes such claims cannot be pursued in this action by February 25, 2014.

**SO ORDERED.**

_____

SARAH NETBURN
United States Magistrate Judge

DATED:  New York, New York
        February 11, 2014

---

[6] Not only did Rahman never assert an age discrimination claim, he has not represented that he was 40 years old at the time that any discrimination (none is alleged) may have occurred. Accordingly, it is not evident that Rahman can even assert a claim under the ADEA.

[7] The draft settlement agreement does include language that Rahman "knowingly and voluntarily enter into this Release."

[8] Under the Court of Appeals' rationale in Gambale v. Deutsche Bank AG, 377 F.3d 133, 143-44 (2d Cir. 2004), the Court finds that there is no compelling reason to disclose the settlement sum in this case.